WHEELER *v.* THE STATE.

[No. 19,775. Filed May 14, 1902. Rehearing denied June 4, 1902.]

COURTS.—*Adjourned Term.—Special Judge.—Holding Court in Two Counties in Circuit at Same Time.*—Where business of the court remains undisposed of at the close of the term, an adjourned term at which a special judge presides may be held and lawfully continued after the commencement of a regular term in another county of the same circuit. *pp. 691–693.*

TRIAL.—*Motion for New Trial.—Argument of Motion.*—The fixing of the time and limit of the argument on a motion for a new trial is a matter within the discretion of the trial court. *p. 693.*

CRIMINAL LAW.—*Coram Nobis.*—No error was committed in refusing to award a writ of *coram nobis* in a criminal cause on the ground that defendant was constrained by threats and fears to forego rights which the law secured to him in his defense, where it is shown that defendant was arraigned and pleaded not guilty; asked and was granted a continuance; demanded and obtained a special venire for jurors; challenged the fitness of the regular judge to preside upon his trial and secured the appointment of a special judge; and at no time was there any attempt by any one to interfere with the regular and orderly proceedings of the court. *pp. 694–696.*

SAME.—*Coram Nobis.*—A petition for a writ of *coram nobis* in a criminal cause was properly denied where it is not charged therein that the jury was not composed of impartial and disinterested triers, or that they were improperly influenced by their alleged surroundings, or that their verdict was not responsive to, and sustained by, the evidence. *p. 696.*

SAME.—*Coram Nobis.*—The proceeding in the nature of a writ of *coram nobis* will not be granted in a criminal cause after trial and conviction, except where it clearly appears that the petitioner had a valid defense, but which, without negligence on his part, was not made because of duress, fraud, or excusable mistake, or that

Wheeler *v.* State.

he was prevented from asserting and enjoying some legal right through duress or fraud or excusable mistake. *p. 696.*

CRIMINAL LAW.—*Continuance.*—In a prosecution for murder defendant asked for a continuance for the reason that because of his mental condition, impaired health, and the effects of a self-inflicted wound, he failed to realize the gravity of the situation in which he stood, and did not employ counsel until about two weeks before the time the cause was set for trial; that the attorney appointed by the court to defend him was young and inexperienced in criminal causes; that the attorney employed by him was so engaged in other professional business that he had no time to consult with defendant, and was weak and sick and threatened with nervous prostration. *Held,* that no abuse of discretion was shown in the denial of a continuance. *pp. 696–698.*

SAME.—*Arraignment.*—Where defendant in a criminal prosecution was arraigned and pleaded not guilty, the subsequent withdrawal of the plea for the purpose of making a motion to quash the indictment did not render it necessary to arraign the defendant a second time. *p. 698.*

SAME.—*Evidence.*—Where in the trial of one charged with the murder of his son-in-law it appeared that defendant and his wife had separated, and the wife and a daughter, to whom defendant had sent some articles of food, were making their home with such son-in-law, the testimony of a witness relative to a statement made by defendant to the effect that he had furnished "grub" for his children, and that there were persons laying around eating it up, and that some "sons-of-bitches that walked the road that he could hardly stand," and slapped his hand on his pocket and said he "had the tools there to stop it with," was competent as tending to show the state of defendant's feelings toward his son-in-law. *p. 698.*

SAME.—*Evidence.*—*Defense of Insanity.*—*Expert Testimony.*—A question and answer on the issue of insanity in a criminal cause: "You may state as to whether or not the scientific idea of insanity draws the line closer than the legal idea of insanity," to which the witness answered: "That is possibly the case, I would not say—well, the courts and doctors don't agree as to the definition of insanity," were harmless. *p. 699.*

SAME.—*Evidence.*—*Defense of Insanity.*—*Expert Testimony.*—The testimony of a medical witness, in answer to a hypothetical question based upon a declaration made by defendant in the form of a threat, that the language used indicated a feeling of ill will grounded upon an actual condition of things, and not a mere illusion, and an intelligent purpose to injure the persons described in the question was proper, since statements made, whether written or spoken, may afford some basis for an opinion concerning the sanity or insanity of the person at the time it was used. *p. 699.*

CRIMINAL LAW.—*Evidence.*—*Defense of Insanity.*—*Expert Testimony.*— For the purpose of ascertaining the peculiar and extreme views of a medical witness on the subject of insanity, a question eliciting the opinion of the witness regarding the sanity of a notorious assassin at the time he took the life of a public officer was within the legitimate bounds of cross-examination.  *p. 699.*

SAME.—*Evidence.*—*Defense of Insanity.*—*Non-Expert Witness.*—*Cross-Examination.*—The refusal of the court to permit defendant, in a criminal prosecution, to ask a non-expert witness, who had testified as to the sanity of defendant, for a definition of the word "mind," was not error.  *p. 699.*

SAME.—*Evidence.*—*Defense of Insanity.*—*Expert Witness.*—*Confidential Relations.*—*Physician and Patient.*—The testimony of a medical witness as to the sanity of defendant was not rendered incompetent by reason of the fact that the witness was the defendant's physician, where the facts upon which the opinion was based were not obtained through his professional relations to defendant.  *p. 699.*

SAME.—*Motive.*—*Instruction.*—An instruction in a prosecution for murder to the effect that proof of a motive to commit the crime is not indispensable nor essential to a conviction, and that the jury would be justified in inferring a motive from the commission of the crime itself, if the commission of the crime by defendant is proved beyond a reasonable doubt, as required by law, states the law correctly, and is not an invasion of the province of the jury.  *p. 700.*

SAME.—*Defense of Insanity.*—*Instructions.*—*Reasonable Doubt.*—Where in a prosecution for murder the court instructed the jury that a motive might be inferred if the commission of the crime by defendant was proved beyond a reasonable doubt, and that defendant was sane at the time, it was not necessary to repeat the statement made in other instructions on the question of reasonable doubt as to the sanity of the defendant.  *p. 700.*

SAME.—*Murder.*—*Evidence.*—*Defense of Insanity.*—Defendant was jealous of his wife, without cause, and, after repeated separations, he became so abusive that she obtained a divorce and went to live with their son-in-law. Defendant accused the son-in-law and his wife of separating him and his wife. He procured a revolver from a neighbor, and, the next day, went to the home of the son-in-law and inquired of his divorced wife where his son-in-law was, and, upon being informed that he was in the field at work, asked if he was alone. He was told that he was alone, and started toward the field. He came back in a short time and told his daughter that her husband told him to have her bring him a jug of water. He told his other daughter to go to the garden and dig some potatoes. As soon as the daughters were gone he made a

violent attack on his wife. The screams of the woman attracted the daughter from the garden, and she saw the son-in-law approaching, crying to his wife, "Oh, Oma! I don't believe I can live till I get to the house." Defendant seized an ax and started toward his son-in-law, who cried, "Don't kill me, please don't kill me." Defendant struck him with the ax, knocking him down, and then struck him another blow, almost severing his head from his body. When the body was examined three gunshot wounds were found in addition to those made with the ax. Defendant told his brother-in-law what he had done, and attempted to commit suicide. His only defense was insanity, which was very meager, it being shown that he had lived, worked, acted and talked as a sane man for more than thirty years immediately preceding the homicide. *Held*, that the evidence was sufficient to support a verdict convicting defendant of murder in the first degree. *pp. 703–706.*

From **Warrick Circuit Court**; *F. H. Hatfield*, Special Judge.

**Willis B. Wheeler** was convicted of murder, and he appeals. *Affirmed.*

*T. W. Lindsey* and *Roscoe Kiper*, for appellant.

*W. L. Taylor*, Attorney-General, *Merrill Moores* and *C. C. Hadley*, for State.

DOWLING, J.—September 7, 1901, the appellant killed Elias Burns, his son-in-law, at the county of Warrick, in this State. He was arrested immediately after the homicide, and four days later an indictment for murder in the first degree was returned against him. September 13, 1901, he was arraigned, and entered a plea of not guilty. The cause was then set down for trial on September 27th. On September 24th he made an application for a continuance, the motion was sustained, and the trial was postponed until October 4, 1901, at which time it was ordered that an adjourned term of the court be held. At the request of the appellant a special *venire* for forty jurors was issued. October 4th the appellant, upon affidavit, demanded a change of judge; his motion was granted, and Mr. Frank H. Hatfield, a member of the Warrick county bar, was appointed a special judge to try the cause. The appellant thereupon filed

a plea of insanity, to which a reply in denial was filed by the State. A motion for a continuance was made by appellant, and was overruled. Appellant again asked that the trial be delayed, and filed additional reasons for its postponement. The application was denied. The cause was then submitted to a jury for trial, and on October 15, 1901, a verdict of guilty of murder in the first degree, with the death penalty, was returned. The defendant appeals.

The errors assigned and not expressly waived by appellant are as follows: "The court erred in overruling appellant's objections to going to trial. The court erred in overruling appellant's motion to extend the time for arguing the motion for a new trial. The court erred in overruling appellant's motion for a writ of *coram nobis*. The court erred in overruling appellant's motion for a new trial."

1. The grounds upon which appellant objected to the trial of his cause at the adjourned term of the Warrick Circuit Court were that said Warrick county was one of the counties embraced in the second judicial circuit, the other counties being Spencer and Perry; that before the trial could be finished at such adjourned term, the regular term of the Spencer Circuit Court would begin; and that the judge of the Warrick Circuit Court had no authority at an adjourned term to appoint a special judge to hold court for him.

As the business of the Warrick Circuit Court remained undisposed of at the close of its September term, 1901, the judge was expressly authorized by statute to adjourn the court to any other time in vacation, and at such adjourned term to proceed with the business of the court as a part of the regular term of said court at which the adjournment was ordered. §1443 Burns 1901. Trials by other judges at such adjourned terms, where changes of venue have been taken from the regular judge, are provided for in the same section. Where an adjourned term is held in one county of a circuit composed of more than one county, it might, and

probably would, sometimes occur that a trial would extend beyond the day fixed by law for the beginning of the term in another county of the same circuit. Even in the absence of a statute regulating the proceedings under such circumstances, we do not think that the adjourned term would be abruptly terminated by the fact that the time fixed by law for the commencement of the regular term in such other county had arrived. If this result followed, the court might be compelled to discharge a jury in a criminal cause on trial at such interrupted adjourned term without the consent of the defendant, and, upon a second trial, possibly he might avail himself of the defense of once in jeopardy. It can not be supposed that the legislature intended the statutes fixing the terms of the courts in a circuit containing more than one county, and providing for adjourned terms whenever the business of any court in the circuit required them, to have this effect. While two regular terms of courts in different counties in the same circuit may not, perhaps, be held concurrently, we can perceive no good reason why an adjourned term of the circuit court in one county, at which a special judge presides, may not be held and lawfully continued after the commencement of a regular term in another county of the same circuit. *Batten* v. *State,* 80 Ind. 395 ; *Smurr* v. *State,* 105 Ind. 125.

In *Batten* v. *State, supra,* it is said by Elliott, C. J.: "It is true that there cannot be two courts in one circuit in session at the same time, in *regular* term." This, we think, is as far as the restriction ought to be carried, and nothing in the cases of *Smurr* v. *State, supra; Cain* v. *Goda,* 84 Ind. 209, or *Batten* v. *State, supra,* conflicts with this view. Whenever a trial is begun and in progress at the time when, by law, the term of the court would expire, the statute extends the term until the close of the trial. §1402 Burns 1901. Counsel for appellant seem to have overlooked §1445 Burns 1901, which declares that if any adjourned term of court, presided over by a judge appointed for that purpose, be ex-

tended so as to include the time set apart for the court in any other county in that circuit, the resident (regular) judge may proceed to hold the court in such other county while such adjourned term is being held. This section renders it entirely plain that an adjourned term in one county of a circuit may continue after the commencement of the time fixed for the regular term in another county in the same circuit. The authority of the regular judge, during an adjourned term, to appoint a special judge is as clearly conferred by the statute as is his right to perform any other official duty during such adjourned term. The adjourned term is made a part of the regular term, and anything a judge might do at a regular term he may do at an adjourned term. §1443 Burns 1901; *Smith* v. *Smith,* 17 Ind. 75; *Sutherlin* v. *State,* 150 Ind. 154.

2. The next error assigned is that the court refused to extend the time for arguing appellant's motion for a new trial. This subject was wholly within the discretion of the court, and it had the right to fix the time, space, or limit of the argument, and when it would hear it. In some cases it has been held that the court may decline to hear arguments upon motions in arrest, or for a new trial. *Howell* v. *Commonwealth,* 5 Gratt. (Va.) 664; *Commonwealth* v. *Porter,* 10 Metc. (Mass.) 263; *Long* v. *State,* 12 Ga. 293. And the argument to the jury in a criminal cause may be confined within reasonable limits, and such regulation will not constitute reversible error unless manifestly prejudicial to the rights of the defendant. 2 Cyc. 701, 704.

The only argument expressly recognized by the statute is the argument to the jury. It is largely in the discretion of the court whether it will hear arguments on motions for a new trial, or upon questions of law addressed to itself. The sickness of one of the attorneys for the appellant did not constitute a sufficient reason for the postponement of the argument, and we find in this ruling of the court no abuse of the discretion with which it was invested.

3.   On the 22d day of October the appellant petitioned the trial court for a writ of error *coram nobis,* and the refusal of the court to award the writ is the third error discussed in the brief of counsel for appellant. The grounds of the application were the existence of excitement and prejudice against the appellant in Warrick county, occasioned by the homicide, and his failure to ask for a change of venue from that county because of his fear of mob violence in case he did so, although he believed that he could not obtain a fair and impartial trial in said county on account of the feeling against him. The nature of the writ *coram nobis,* and the circumstances under which a proceeding of that character may be maintained, are stated with great fullness of learning by Elliott, J., in *Sanders* v. *State,* 85 Ind. 318, 44 Am. Rep. 29.   It was there held that a proceeding of this nature may be maintained in this State, and that it is the appropriate remedy when it is necessary to bring some new fact before the court which can not be presented in any of the methods provided by statute.   A defendant who enters a plea of guilty upon a necessity produced by a well-grounded fear and imminent danger of mob violence may, according to the authority of that case, avoid the plea by a proceeding in the nature of a writ of *coram nobis.*   In Sander's case it was clear that the plea of guilty was extorted from him "by a well-grounded fear and imminence of mob violence." The danger was so apparent and pressing that he dared not ask for any delay of the trial, and was compelled to withdraw his plea of "not guilty," and enter a plea of "guilty."

In the case before us the situation was wholly different. In our statement of the facts we set out with some particularity the various steps taken on behalf of the appellant, and the dates of the different motions and proceedings.   Arraigned upon the indictment September 13th, he pleaded not guilty, and his trial was set for the 27th of the month. He applied for a postponement of the trial, and it was delayed until October 4th. He demanded a special *venire* for

jurors, and the writ was issued. He challenged the fitness of the regular judge of the court to preside upon his trial, and another judge was appointed. Ten or eleven days were occupied in the trial. Two men were considered a sufficient force to guard the jail where appellant was confined. Whenever it was thought necessary, upon the order of the judge of the court, appellant was removed to the jail of another county, or to a safe place some three miles from the county seat. At no time, after the homicide was committed until judgment was entered on the verdict, was there any attempt by any one to interfere with the regular and orderly proceedings of the court. These facts, all of which are of record, positively contradict the statements of the appellant that he was constrained by threats and fear to forego any right which the law secured to him, and prove that, even if his fears for his safety were excited, those fears were not well grounded. Popular excitement and indignation are the natural results of shocking crimes, and it is not to be expected that a community will remain calm and unmoved when such offenses are perpetrated in its midst. But the existence of sentiments of grief and horror, even when they are given audible expression, does not of itself always constitute sufficient ground for a belief on the part of the accused that he dare not demand the rights secured to him by law. The appellant was under no such apprehension or duress. He asserted those rights, and, in every instance, they were accorded to him by the court. The community submitted to the authority of the law and refrained from violence. It appears from the incontestible evidence of the record itself that the court, throughout the proceedings, had the ability and the inclination to afford to the appellant the protection from mob violence to which he was entitled, and that it gave him the opportunity to exercise every privilege secured to him by the Constitution and the laws. Had the dangers of the situation required it, an application for a change of venue from Warrick county could have been made

upon his affidavit, while he was in the jail of Vanderburgh county, and decided in his absence. *Jones* v. *State,* 152 Ind. 318.

But there is another and sufficient reason for denying the relief afforded by a proceeding in the nature of a writ *coram nobis.* It is not charged in the appellant's petition that the jury was not composed of impartial and disinterested triers, or that they were improperly influenced by their alleged surroundings, or that their verdict was not responsive to, and sustained by, the evidence. The rule is that the extraordinary relief afforded by a proceeding in the nature of a writ *coram nobis* will not be granted in a criminal case after trial and conviction, except where it clearly appears that the petitioner had a valid defense in the facts of the case, but which, without negligence on his part, was not made because of duress, fraud, or excusable mistake; or that he was prevented from asserting and enjoying some legal right through duress, or fraud, or excusable mistake, these facts not appearing on the face of the record, and being such as, if known in season, would have prevented the rendition and entry of the judgment in question. The appellant's case did not meet the requirements of this rule, and his petition was properly denied.

4. The last question to be determined is whether the court erred in overruling the motion for a new trial. Under this assignment it is objected that the court erred in refusing to continue the cause upon appellant's application from the September term until the December term of the court. The first application for a continuance was made September 24th, and the court postponed the trial until October 4th. On that day appellant renewed his motion for a continuance until the December term, and the court overruled the motion. The reasons for which a continuance was asked in each instance were that the appellant, because of his mental condition, impaired health, and the effects of a self-inflicted wound, failed to realize the gravity of the situation in which

he stood, and did not employ special counsel until September 15th; that the attorney appointed by the court to defend him was young and inexperienced in criminal causes; that the attorney employed by him was so engaged in other professional business that he had no time to consult with appellant; and that, for the same reason, he had not been able to make the necessary preparation for trial; that his attorney was weak and sick and threatened with nervous prostration, and one day had been confined to his bed. A further reason for which a continuance was asked was the absence of a medical witness named Pritchell; but, as the witness was present at the trial, and the appellant had the opportunity to examine him, he suffered no injury by the refusal of the court to continue the case on acount of his absence, and such ruling does not constitute reversible error. *McDermott* v. *State,* 89 Ind. 187, 189.

According to his own statement, appellant had not less than two weeks for consultation with his attorneys, and, as the only defense was insanity, and the appellant had lived in Warrick county nearly all his life, it can not be said that he had not sufficient time to prepare for trial. The fact that one of appellant's attorneys had other professional engagements which made it inconvenient for him to give the attention to this case which its importance demanded, was not a good cause for postponing the trial. Nor was the state of the health of this attorney a sufficient cause for delay. It was not shown that he was so ill as to be unable to prepare the case or to take part in the trial, and it did appear that there were other attorneys in the defense. The trial court was in a much better position to decide upon the merits of this application than we are. The motion was addressed to its sound discretion. The affidavits made no such case as left the court no legal option to refuse to grant the delay asked for; and we find in its decision no abuse of the discretion which it was authorized to exercise. *Weaver* v. *State,* 154 Ind. 1; *Burchfield* v. *State,* 82 Ind. 580; *Smith* v. *State,*

132 Ind. 145; *Moulder v. Kempff,* 115 Ind. 459; *Eslinger* v. *East,* 100 Ind. 434.

The objection that the appellant was not arraigned is contradicted by the record, which shows an arraignment and a plea of not guilty. The subsequent withdrawal of the plea for the purpose of a motion to quash the indictment did not render it necessary to arraign the appellant a second time. Besides, it appears from the record that the appellant, after his motion to quash was overruled, without objection, again pleaded to the indictment, and expressly waived a second reading of it by the clerk. There is nothing in the objection. §1831 Burns 1901; *Stewart v. State,* 111 Ind. 554; *Turpin* v. *State,* 80 Ind. 148; *Molihan* v. *State,* 30 Ind. 266; *Sohn* v. *State,* 18 Ind. 389; *Feriter* v. *State,* 33 Ind. 283; *Wood* v. *State,* 92 Ind. 269.

Appellant complains of the decision of the court admitting the following testimony of the witness J. C. Leslie: "Why, he [appellant] was talking a little about his troubles there, and about him having furnished 'grub' for his children, and said, there are some laying around eating it up, and spoke something about some sons-of-bitches that walked the road that he could hardly stand, and slapped his hand on his pocket, and said he had the tools there to stop it with." This evidence was competent. The facts that appellant's daughter was the wife of Elias Burns; that another child of appellant made her home with Burns and his wife; that appellant's wife lived with her daughter, Mrs. Burns; and that some of Burns' relatives also were there, were shown by other witnesses. It was also proved that the appellant sent some vegetables and other food to Burns' house for the use of his children. The threat was against the person or persons who were eating the articles intended for appellant's children. Burns came within this description, and the evidence tended to show the state of the appellant's feelings toward him, and was admissible for that purpose. Its weight

was a question for the jury. *Parker* v. *State,* 136 Ind. 284, 287.

The court permitted a witness to answer the following question: "You may state as to whether or not the scientific idea of insanity draws the line closer than the legal idea of insanity." To which the witness answered: "That is possibly the case; I would not say—well, the courts and doctors don't agree as to the definition of insanity." The question was absurd, and the answer meaningless. Such stuff could neither help the State nor harm the appellant. The opinion of Dr. McCoy upon a hypothetical question amounted to this: that the language attributed to the appellant indicated a feeling of ill-will, grounded upon an actual condition of things, and not a mere illusion, and an intelligent purpose to injure the persons described in the question. We find nothing objectionable in the testimony. The language used by a defendant whether written or spoken may afford some basis for an opinion concerning his sanity or insanity at the time it was used.

For the purpose of ascertaining the peculiar and somewhat extreme views of another medical witness upon the subject of insanity, on cross-examination her opinion was asked regarding the sanity of a notorious assassin at the time he took the life of a public officer. The question was within the legitimate bounds of cross-examination.

The refusal of the court to permit the appellant to ask a non-expert witness for a definition of the word "mind" was not error, and requires no further notice.

As it did not appear from the question put to Dr. Williams, a witness for the State, or his answer to that question, that any of the facts upon which he based his opinion of the mental condition of the appellant were obtained through his professional relations to the appellant as his physician, the question was a proper one, and the answer to it was competent evidence. *Edington* v. *Ætna Life Ins. Co.,* 77 N. Y. 564.

Instructions numbered twenty, twenty-eight, twenty-nine, thirty, thirty-two, and forty-eight, given by the court, are complained of by appellant. Number twenty was as follows: "Proof of a motive to commit the crime is not indispensable nor essential to conviction. While a motive may be shown as a circumstance to aid in fixing the crime on the defendant, yet the State is not required to prove a motive on the part of the defendant in order to convict, and the jury would be justified in inferring a motive from the commission of the crime itself, if the commission of the crime by the defendant is proved beyond every reasonable doubt, as required by law, and you find that the defendant at the time of the commission of said act was sane, and there were no extenuating circumstances." The instruction was sanctioned by the decisions of the court, and in no degree invaded the province of the jury. *Hinshaw* v. *State,* 147 Ind. 334, 364; *Blume* v. *State,* 154 Ind. 343. It was not necessary to repeat in this connection the statement that the jury must be satisfied beyond a reasonable doubt of the sanity of the appellant. Other instructions sufficiently informed the jury upon the subject of reasonable doubt.

Number twenty-eight was in these words: "A person who is insane only at intervals may, during a lucid interval, commit a crime and be responsible therefor, if the evidence shows beyond every reasonable doubt that at the time of the commission of the crime the person had sufficient mental capacity and will power to make him criminally responsible under the law. It is not a question of whether he exercised sufficient will power or not, but the question is, did he possess sufficient will power at the time to resist the impulse to commit the crime, and could he have resisted had he tried?" This statement of the law is clear enough without an attempt on the part of the court to define the term "mental capacity." It did not purport to state a rule by which the jury were to be governed in deciding the question of the sanity or mental capacity of the appellant, but was confined to the sub-

ject of the legal responsibility of one committing a crime during a lucid interval. Taken in connection with instruction number twenty-six, it could not be misunderstood by the jury, and was a correct exposition of the law.

Number twenty-nine: "When it appears from the evidence that insanity has once existed in the defendant, whether or not it will be presumed to continue depends on the nature of the mental malady. If it is of a permanent and chronic character, then it is presumed to continue to exist until the contrary appears from the evidence; but if the insanity is the result of physical disease, a weakened condition of the system, remorse, disappointment, shattered hopes, jealousy, an excited condition, strong passions, violent temper, or some other temporary or transient cause, and lucid intervals appear, then no presumption as to its continued existence is indulged, and the mental condition of the defendant at the time of the commission of the crime is to be ascertained by the jury from all the evidence and circumstances of the case." The objection taken to this instruction is trivial and without merit. Counsel say that there was no proof that appellant was a man of violent temper, and that the instruction was bad because there was no evidence to which it applied. In the testimony regarding his treatment of his wife, and of his threats against the persons charged by him with eating food sent by him for the use of his children, there was abundant proof of a violent temper.

Similar objections are made to number thirty, and, for the same reasons, they must be disregarded. That instruction was as follows: "Depression or weakness following from physical illness, and such as in all respects ordinarily takes place with men possessing fair average mental power, is not of itself insanity, but if disease of whatever kind or character leave the patient in such weakened mental condition that he can not resist the impulse to commit a crime, he is not of sound mind. A person may have sufficient mental capacity to know right from wrong, and be able to compre-

hend the nature and consequences of his act, and yet be not criminally responsible, for to make him criminally responsible he must not only be able to know and comprehend right from wrong, but also to have the will power to control and resist an impulse to commit crime." This instruction was highly favorable to the appellant, and it is impossible to conceive how he could have been harmed by it.

The only supposed defect pointed out in number thirty-two is that there was no evidence in the case to which it applied. It is sufficient to say that a large part of the evidence for the appellant was intended to show that he was a monomaniac upon the subject of the chastity of his wife, and it was entirely proper for the court to inform the jury on the law applicable to crime committed by a person so affected.

Those parts of instruction numbered forty-eight, which are criticised by counsel, are these: "The court has done all in its power to advise, clarify, and make plain to you the laws of the State governing this case, and now you, gentlemen of the jury, are confronted with the final and important duty of deciding on the guilt or innocence of the prisoner, and upon the question of his sanity or insanity. * * * If, after a careful determination of the law and the evidence in this case, each of you is satisfied beyond every reasonable doubt that the defendant is guilty, or that he is not guilty, of one of the crimes above defined, you should then return your verdict accordingly." In view of the repeated admonitions of the court that a reasonable doubt upon any material fact in the case would entitle the appellant to an acquittal, and that before he could be convicted his guilt must be established beyond a reasonable doubt, we can not believe that anything in this instruction could have misled the jury.

A careful reading of instructions numbered six and fifteen, tendered by the appellant, modified by the court, and given as modified, satisfies us that the modifications made by the court were reasonable and proper, and that the instructions as tendered did not correctly state the law. The fact

that the appellant had occasionally spoken of his son-in-law as a good citizen, and an honest man, and the like, was, in view of the other evidence in the case, wholly immaterial.

Instructions numbered seven, seven and a half, eight, eleven, sixteen, eighteen, nineteen, twenty-two, and twenty-four, tendered by the appellant, and refused by the court, contained nothing properly applicable to the evidence in the case which was not fully and clearly set forth in the instructions given by the court. The instructions tendered contain many statements of the law which we can not approve, and which were arguments for the appellant upon the evidence, rather than directions as to the law of the case. We find no error in the action of the court in refusing to give these instructions.

The last reason assigned for a new trial was that the evidence was not sufficient to sustain the verdict. We might, under the repeated decisions of this court, dismiss this proposition with the statement that there was evidence to sustain the verdict, and that it is not the province of this court to weigh it. But the fact that the penalty assessed by the jury is death has constrained us to review that evidence with the most scrupulous care, and to satisfy ourselves that no material fact essential to the guilt of the appellant remained unproved. Omitting all minor details, it appeared that the appellant at the time of the homicide was about forty-five years of age, and that he had lived in Warrick county from his birth; he was married there, and, shortly afterwards, he became jealous of his wife without cause, and was so unkind and abusive that she was compelled to leave him. At his earnest solicitation she returned to him fourteen months later, and they lived together until the spring of 1901. Appellant continued to make groundless charges of improper conduct against his wife, and, on one occasion, he made a violent attack upon her with a chair. She left him, and instituted proceedings for surety of the peace, and he was required to give bond for his good

behavior.    Shortly after this he prevailed upon his wife to
live with him again, and she returned to his house.    Appel-
lant's conduct was such that his wife could not endure it,
and she once more fled from her home, and, in June, 1901,
obtained a divorce.    By the terms of the separation, the chil-
dren and property were divided, and the appellant agreed
to furnish his wife with provisions for her table until the
crops were gathered.    One of appellant's daughters had mar-
ried Elias Burns, a man of unexceptionable character and
habits, and, after the divorce, appellant's wife, with two
children, made her home with Burns and their daughter.
Appellant occupied a house a quarter of a mile from the resi-
dence of his wife.    The appellant seemed to be discontented
with the situation, and sought to have his divorced wife
marry him.    He accused his son-in-law, Burns, and his
daughter, of separating him and his wife.    A brother of
Burns spent a short time at Burns' home, and appellant com-
plained that others were eating what he intended for his chil-
dren.    September 6, 1901, appellant asked a neighbor to
lend him a gun, and afterwards, in the absence of this neigh-
bor, went to his house, and took his neighbor's revolver.    The
next day he went to Burns' home, and found his divorced
wife there.    He asked if she was alone, and was told that her
daughters, Mrs. Burns, and Vanney, a younger sister, were
in the house.    He asked where Elias Burns, his son-in-law,
was, and whether he was alone.    He was told that he was in
his tobacco patch, and that no one was with him.    Appel-
lant left the house, and proceeded toward the tobacco patch.
He came back in a little while, and said to Burns' wife,
"Elias told me to have you bring him a jug of water, and to
go by my tobacco patch and get my tobacco knife, and take
it to him."    Burns' wife then left the house to take the
water and knife to her husband.    As soon as she went away,
appellant directed his younger daughter, Vanney, to go into
the garden to dig potatoes for her mother.    The child went
as she was told, and appellant was left alone with his wife.

He made a violent attack upon her, drew his revolver, and threw her to the floor. The screams of the woman were heard by the little girl, Vanney, who ran back to the house, shouting "there comes Elias." Burns was seen walking toward his house, fanning himself with his hat, and crying, "Oh, Oma. Oh, mercy. I don't believe I can live till I get to the house." Appellant desisted from his attack upon his wife, went out of the house, and walked toward Burns. He seized an axe lying near a wood pile, and rushed at Burns, who stood still and cried, "Oh, Buck, don't kill me. Please, Buck, don't kill me." Appellant struck him twice with the blunt end of the axe, knocking him down. In the presence of Burns' wife, he struck another blow with the edge of the axe, almost severing Burns' head from his body. The wife testified that she could "hear the blood roaring in his throat." Burns' wife followed appellant screaming and crying. He said to her, "Hush, Oma, hush, don't take on so; it can't be helped now. If you don't hush, you will send me to the penitentiary." When Burns' body was examined by the coroner, three gun-shot wounds were found upon it, in addition to the wounds inflicted with the axe.

Appellant then walked over to a field where a brother-in-law was at work, and told him that he had killed Elias, and thought he would kill himself, and save some one else the job. His brother-in-law tried to dissuade him from suicide. The appellant went into the woods and shot himself, the bullet entering beneath his chin, and coming out near his eyes. On the trial the only defense relied upon was insanity. The evidence in support of the plea was meager, and utterly unsatisfactory. It was proved that his mother and father were cousins, and that his mother was of an exceedingly jealous disposition, which he seemed to have inherited. The appellant had lived, worked, acted, and talked as a sane man for more than thirty years immediately preceding the homicide; and no suggestion of insanity was

Vol. 158—45

made until his plea was entered in this case. The evidence fully sustained the verdict that the appellant, at the time he committed the homicide, was of sound mind, and that he was guilty of premeditated murder. The investigation of all the facts of the case, both on the part of the prosecution and the defense, was thorough, and minute; the interests of appellant were fully and skillfully represented by his counsel, and an able and conscientious judge presided upon the trial with absolute fairness and impartiality. The verdict of the jury stands firmly upon the law and the evidence, and we have been able to discover no reason why it should be set aside.

We find no error in the record, and the judgment is affirmed.