DAVIS *v.* STATE OF INDIANA.

[No. 24,878.  Filed May 18, 1928.]

*Emshwiller & Emshwiller* and *Eichhorn, Gordon & Edris,* for appellant.

*Arthur L. Gilliom,* Attorney-General, *Edward J. Lennon, Jr.,* and *George J. Muller,* Deputies Attorneys-General and *U. S. Lesh,* for the State.

MARTIN, J.—Appellant, with forty-nine others, was charged by an indictment in two counts with having entered into a conspiracy to commit a felony, §641, ch. 169, Acts 1905, §2882 Burns 1926, the felony being that defined in Acts 1889, ch. 140, §4, §3004 Burns 1926. The first count charged that they conspired to "unlawfully and feloniously place and deposit a shell and bomb containing dynamite and other nitro explosive compound upon, against and about the premises and building of Harris Martin, situated in and being the East end of the Columbia Hotel in Montpelier, Indiana, with the intent then and there to explode and discharge the same and injure the property of the said Harris Martin, without the consent of said Harris Martin, contrary to the form

of the statute," etc, and the second count charged that they conspired to, "unlawfully and feloniously carry, concealed on and about their person, a cartridge, shell and bomb containing dynamite and other nitro explosive compound . . . for an unlawful and illegitimate purpose, to-wit, to explode and discharge the same against the wall, building and premises of one Harris Martin. . . ."

Section 3004 Burns 1926 is as follows: "Whoever (1) carries concealed on or about his person any cartridge, shell or bomb containing dynamite or other nitro-explosive compound for any other than legitimate and lawful use or (2) uses or attempts to use the same in any manner to the injury of persons or property, or (3) shall place or deposit the same upon or about the premises of another without the consent of such person, shall upon conviction thereof be imprisoned in the penetentiary not less than two nor more than fourteen years." The numbering (1), (2) and (3) we have inserted in the statute for reference in the discussion which follows.

Appellant, to support his contention that the court erred in overruling his motion to quash the first count of the indictment, contends that this count attempts to allege only the felony defined in that portion of the statute above numbered (3) and is fatally defective because it "does not charge a *placing without consent,* but charges a placing *with the intent to explode the same and injure the property without the consent of the owner*." The gist of what is charged by this count is feloniously conspiring to use or attempting to use a bomb, of the kind described, to injure the property of Harris Martin and it is not limited to a single clause of the statute. Appellant suggests that an attempt to use dynamite or other nitro-explosive to destroy property at the request of the owner, or otherwise with his consent, might constitute a legitimate and lawful use of the

explosive not within the language of the statute. But the averment that the alleged act was unlawful and felonious sufficiently charged that what defendants conspired to do was not to destroy the property lawfully with the owner's consent. *Asher* v. *State* (1924), 194 Ind. 553, 143 N. E. 513; *Parker* v. *State* (1925), 196 Ind. 534, 149 N. E. 59. And the charge that the conspiracy was to attempt to "injure" the property of another carried the implication of an attempt to inflict damage in violation of law. *City of North Vernon* v. *Voegler* (1885), 103 Ind. 314, 2 N. E. 821; *Jordan* v. *State* (1895), 142 Ind. 422, 41 N. E. 817; *Trustees, etc.*, v. *New Albany Water Works* (1923), 193 Ind. 368, 140 N. E. 540. The first count of the indictment was sufficient.

Appellant contends that the second count of the indictment attempts to charge only the felony defined in that portion of the statute above numbered (1) and is fatally defective because it failed to charge an unlawful and illegitimate purpose when it charged "for an unlawful and illegitimate purpose, to wit, to explode and discharge the same against the wall, building and premises of one Harris Martin," in that "there is no allegation that the carrying concealed was for the purpose of placing it upon the premises of Harris Martin, *without his consent*." For the reasons stated above, we believe the second count clearly charged a conspiracy to carry such a bomb concealed "for other than legitimate and lawful purpose," was not limited to a single clause of the statute, and that the facts stated sufficiently showed that the exploding of a bomb against the wall of Harris Martin's building was not to be with the lawful purpose of using dynamite to wreck his building for his benefit and by his procurement. The second count was sufficient and no error was committed in overruling the motion to quash.

Upon appellant's plea of not guilty, a jury trial was had, a verdict finding appellant "guilty as charged" was returned and the court rendered judgment fining appellant $100 and sentencing him to prison for not less than two nor more than fourteen years.

Errors assigned and relied upon for reversal, in addition to those discussed above with reference to the sufficiency of the indictment, were that the court erred in overruling appellants' motions for a new trial and in arrest of judgment. The motion for a new trial was for the alleged reasons that the verdict is not sustained by sufficient evidence, that counsel representing the state was guilty of misconduct in argument, and that certain evidence was improperly admitted. Appellant, after the submission of the cause and after the briefs were filed, has petitioned for a writ of error *coram nobis*, showing that certain testimony at the trial was perjured and fraudulent.

The trial of this cause lasted about a month, and the bill of exceptions containing the evidence constitutes almost 2,000 legal-size typewritten pages of the record. Briefly stated, the case made out by the state's evidence is as follows: There were two companies with manufacturing plants that included foundries in the city of Montpelier which had the same officers and managers, both employing molders and coremakers who belonged to an organization called the Molders Union. All of the molders, coremakers and apprentices employed at one foundry quit work, and two days later those employed at the other foundry were paid off and discharged. Appellant was a molder who belonged to the union, and had been in charge of a department at the latter foundry up to the time the men working there (including appellant) were discharged. Men were brought in from other cities to take the places of the men who had thus quit or been discharged, and were lodged at the Columbia Hotel,

which was owned and operated by Harris Martin. These men were taken each morning from the hotel to the foundries where they worked, and each evening were brought back to the hotel, in trucks operated by their employers. The striking workmen proceeded to picket the hotel, as well as the two plants, and would gather near the door of the hotel each morning when the trucks came for the men lodged there, and each evening when the men returned from work, and would make a great noise, calling the men "scabs," "sons-of-bitches" and "pigs," making a noise ("poohey") like calling hogs, and shouting to the "pigs" to come out and get their "slop," making other derisive remarks, pushing, shoving and "milling around," and "razzing" the "strike breakers." The day after the molders and coremakers were discharged from the second plant, Merle Marks said to one of the workmen who had come to take their places, "I warn you that you will have to take the consequences of what you get from working there," and the next morning a party of the strikers, led by Chester Brenner, accosted the same workman while he was at breakfast, and told him to get his clothes and leave on the next car, and he did leave Montpelier for some days. After he returned, Chester Brenner and some of the other defendants called this man a vile name, and said they would disfigure him so that his wife would not know him. A week after the men were paid off and dismissed from the second foundry, thirty-five or forty "picketers" assembled outside the door of the hotel, and when the men lodged there attempted to get into the truck, one of them was struck and knocked down, and the others ran back into the hotel, except one man who got into the truck. Bert McCullick and Chester Brenner and others of the defendants were in the crowd on the sidewalk when this happened. There was no evidence that appellant was present at any time when there was fighting between

the pickets and the strike breakers. The city marshal then drew lines on the pavement at some distance from the hotel door, which the picketers were not permitted to cross when the trucks were loading and unloading. Some of the defendants served as pickets about the hotel every morning when the men went to work and every afternoon when they came back, and in the evenings. They served as pickets in squads, each of which was under a leader; appellant was the leader of one squad and Bert McCullick of another, while Chester Brenner took an active part in the picketing, and Bert Reeves had charge of the picketing the night of the explosion. Bert McCullick was president of the local union, which held meetings each day. The members of the union received their assignments to picket duty at the meetings, and the hotel was picketed from 6 until 11 o'clock each evening, and some nights until 12:30 or 1 o'clock. Merle Marks lived at Indianapolis, and was at the head of the union in the state, and a representative of the International Molders Union, and he came to the employing company as agent of the union before the strike, and was in Montpelier after the strike commenced and before the explosion. Chester Brenner and Bert McCullick asked the hotel keeper, Harris Martin, not to keep the men at his hotel, and at another time Chester Brenner told Martin that he would best consider before keeping the men there, as seventy-five fellows were working there and "we will do all we can to keep you from getting any business," and Bert McCullick also asked Martin not to keep the men, saying "We have pulled off a strike, and would like for you to co-operate with us." The meeting place of the strikers was in a hall, upstairs, about 175 feet down the street from the hotel, and on the opposite side of the street, where they assembled at 9 o'clock each morning, and they went in and out of there through the day, and especially at

night, after supper. On Christmas day, two weeks before the explosion, Bert Reeves, when asked what idea they had of winning the strike, replied that "they would come from all over the country, from other towns, the union, from Hartford City, Muncie, Fort Wayne, and as far as Pennsylvania they would gather here to help," and finally said: "It will not be three weeks, there will be just smoke, and that will be the end of the hotel." The night before the explosion, Bert Reeves had a conversation with a hardware merchant whose store was across from the hotel, in which he said the merchant was "against the strikers," and asked him to "take a different stand"; the merchant said, "You fellows are hurting my business, and I am against you fellows raising hell," when Reeves replied: "If you are not with us you will be hurt awfully bad. We are going to win this strike whether or no. We have $50,000 and are going to spend every dollar of it to win the strike." And he added that if one of those strike breakers should get over that white line, they would "knock him and raise hell with him," and that "there would be hell before it was over." A few days before the explosion, Bert McCullick said to a physician of Montpelier who asked about the prospects of winning the strike that "We will win the strike if we have to put the God damned places out of business"; he said either "things" or "places." A couple of days before the explosion, Jerry Engle, a member of the union, who was chief of police in Montpelier, after stating that he had an honorary molders card in his pocket, said that in his opinion the boys were getting desperate. Ten days before the explosion, in a conversation with the proprietor of a pool room, who told him "you have lost the strike" because the boys would go away to find work, Bert McCullick said: "They will all stick till hell freezes over, and you will wake up some morning to find that something has

happened." A week or ten days before the explosion, Timothy Sullivan asked a hardware clerk for a revolver and said he had been accosted by strike breakers and deputy sheriffs and wanted the gun for his own protection, but was told the store did not have any.

The explosion occurred in the early morning (1:20 a.m.) January 9, 1924, when a bomb containing dynamite or other explosive was exploded on the premises of Harris Martin, by which large holes were blown through the front wall and floor of the hotel, and the building was otherwise seriously damaged. The sixty-seven men whom the foundry companies had brought from outside Montpelier to take the places of the strikers, were all lodged at this hotel, and many of them, as well as the field representative of the National Founders Association, by whom the men were sent, and Harris Martin and his family were in the hotel when the explosion occurred. The evening before the explosion, Bert McCullick called the long distance telephone operator at Hartford City (the county seat) and asked for Merle Marks, at Indianapolis, giving his telephone number there, and when he was connected with a party at Indianapolis who said his name was Merle Marks, the operator heard McCullick say there was "going to be something happen about nine o'clock." The appellant and others of the strikers were picketing in front of the hotel that evening. Bert Reeves, on the night before the explosion, asked John Crismer if he "knew they were not allowed to go in the alley that night." At about 10:15 that evening, none of the men who had established picket lines about the hotel on previous dates were about it, but the appellant and Jay McPherson, Bert Reeves and two others of the strikers were standing close together in a group, and seemed to be talking together, about 250 or 300 feet north of the hotel. After 1

o'clock the next morning, and just before the explosion occurred, a man was seen a square from the hotel, running "pretty fast" away from that direction, who "slowed up" at the street intersection and looked back toward the hotel, turned east into High Street and then ran on "pretty fast" seventy-five or eighty feet past the corner, when the explosion occurred. This man was about five and a half feet tall, weighed about 140 pounds, did not have a mustache and had on a gray or light tan slipover sweater and a dark cap with a bill to it, but no overcoat. Elmer LaTour, sleeping upstairs not far from this corner, testified that he dressed and came down the stairs upon the street after the explosion and saw appellant coming along High Street from the east, with a cap and a sweater on and carrying a light overcoat on his arm and other witnesses saw appellant in the crowd that gathered at the hotel soon after the explosion, wearing a cap that had a bill to it, a sweater and a rain-coat or light overcoat. Immediately after the explosion a witness saw Jay McPherson running north from the direction of the hotel, and turning east into the next cross street. An hour after the explosion appellant was overheard by Elmer LaTour to say to Jay McPherson "Just keep your mouth shut. You don't know nothing about it." This was at the restaurant in "the next building on the west side of the street down Main street." And between 2 and 3 o'clock that same morning, in a pool room near the hotel, appellant told Clyde Brown, a teamster of his acquaintance, that he didn't know what he would do, maybe he would be taken in, and he couldn't prove himself at home, that he and his wife had been quarreling, and he had not been home for some time, that he had been sleeping in the lodge room.

The appellant contends that he was lawfully engaged and associated with his codefendants in conducting a labor strike and was lawfully engaged in picketing, and

that proof of these acts is not proof that he conspired with the other strikers to dynamite the hotel building and does not warrant his conviction for that felony; also that if a combination, innocent in its inception, is afterwards perverted to unlawful ends, only those shown to have participated in the perversion are conspirators.

We do not agree with appellant's statement that the kind of "picketing" he was engaged in was lawful. *Karges Furniture Co.* v. *Amalgamated, etc., Union* (1905), 165 Ind. 421, 75 N. E. 877, and *Shaughnessey* v. *Jordan* (1916), 184 Ind. 499, 111 N. E. 622, which he cites, do not approve or declare to be lawful any such actions, conduct and methods as the striking employees here used. In *Karges Furniture Co.* v. *Amalgamated, etc., Union, supra,* it was said:

"Under no circumstances have pickets the right to employ force, menaces, or intimidation of any kind in their efforts to induce nonstriking workmen to quit . . . neither have they the right . . . to assemble about the working place in such numbers or in such manner as to impress workmen employed . . . . with fear and intimidation."

One of the principal defense witnesses, Jay McPherson, a codefendant, testified that, "Our purpose was to know who was working there; we thought that if we would picket that shop that those men would leave and we could get our jobs back; we were out there to do peaceful picket duty." If that purpose only had been carried out, the picketing would have been lawful, but the evidence shows that what they did was improper and unlawful and the place they did most of it was not a proper place even for lawful picketing. Although, in *Thomas* v. *City of Indianapolis* (1924), 195 Ind. 440, 145 N. E. 550, it was pointed out that, "many courts whose opinions are entitled to great weight have taken the position that all picketing as that term is used in modern practice, is unlawful and should be restrained," on the

theory that there can be no such thing as "peaceful picketing," this court, by the Karges case, *supra*, determined that the practice of picketing can be carried on in Indiana (unless restrained by statute or ordinance, *Thomas* v. *City of Indianapolis, supra*), by the appointment of pickets "to visit the vicinity of factories for the purpose of taking note of the persons employed, and to secure, if it can be done by lawful means, their names and places of residence for the purpose of peaceful visitation," and that the law grants to workingmen the right to support their contests for better conditions by arguments and persuasion, provided they are of such a character as to leave the persons solicited feeling at liberty to comply or not, as they please. But nowhere in the law have we found any authority for the *picketing of the residence* of a person employed at a factory where a strike is in progress. See §331 Oakes, Organized Labor and Industrial Conflicts; Martin, Modern Law of Labor Unions, ch. 13. The residence of the workmen in this case was the Columbia Hotel, and they had the right of privacy and the right to be secure and unmolested there, the same as any other citizen has in his home.

Proof of the fact that appellant was engaged with others in the common enterprize of illegal picketing is not proof that he joined in a conspiracy to destroy property by means of an explosive and the appellee does not so contend. It is not clear, however, from the state's brief, just what portions of the great mass of evidence it relies on as having proved appellant's participation in a conspiracy to commit the felony. We assume that appellee deems the proof to have been made: (1) By actions and statements of appellant and others from which the inferences might be drawn that there was a conspiracy to commit the felony and that appellant participated in the same; and (2) by circumstantial or

inferential proof that the overt or culminating act of the conspiracy was committed by appellant.

A conspiracy may be established by circumstantial evidence alone, *Archer* v. *State* (1886), 106 Ind. 426, 7 N. E. 225, where there is a concurrence of sentiment and co-operative conduct, *McKee* v. *State* (1887), 111 Ind. 378, 12 N. E. 510; it is not essential to show a formal agreement between the parties to do the acts charged but there must be facts proved from which the jury may infer that there was a meeting of the minds of the parties understandingly so as to bring about an intelligent and deliberate agreement to commit the offense. *Eacock* v. *State* (1907), 169 Ind. 488, 82 N. E. 1039; *Brewster* v. *State* (1917), 186 Ind. 369, 115 N. E. 54.

The proof made by the state to establish the explosion as the overt act of those charged with the felonious conspiracy was the testimony that two men ran from the scene of the explosion, Jay McPherson and another man wearing a sweater and cap. The testimony of the witness Elmer LaTour *by inference* only identified this latter man as the appellant. There was no direct evidence of what caused the explosion or that appellant in his conversation with his four fellow strikers in their talk about 300 feet from the hotel on the evening the explosion occurred, or at any other time, conspired to commit any felony, unless the conclusion of conspiracy can be drawn from all the circumstances above related.

Appellant's participation in the strike was summed up by one of the principal witnesses for the state, the manager of the two plants involved, who testified that he had observed him "picketing" as follows: "I did not see him do anything except be there. I saw him in a good many places, no particular place. The fact is I did not see him do anything except be there and there was nothing that stood out that would call

itself to my attention and place him any particular place, except that he was there around the crowd."

The appellant introduced evidence which denied a great deal of what was testified to by the state's witnesses, and explained, in a manner consistent with his innocence, many of the facts to which they testified; but it is not within our province to weigh the evidence—that was for the jury and the trial court. *Winters* v. *State* (1928), *ante* 48, 160 N. E. 294, and cases there cited in note five.

We have considered all the evidence favorable to the state for the purpose of determining if it is sufficient to sustain the verdict. But we find it unnecessary to determine this question, inasmuch as we have decided to grant the appellant's petition for a writ of error *coram nobis,* which action will take out of the case, for the purpose of our consideration, the testimony of Elmer La-Tour. Without his testimony, we hold that the evidence is insufficient to sustain the verdict.

Appellant, prior to the second oral argument in this cause, filed his petition for a writ of error *coram nobis,* alleging therein that the testimony of Elmer LaTour given on the trial was wholly false and untrue; that La-Tour had repudiated his said testimony and admitted that it was false and perjured and had executed an affidavit (which is attached to the petition) setting forth the false and perjured character of his testimony and also containing certain allegations to the effect that he had been induced to swear falsely by the prosecuting attorney; that the only testimony directly connecting appellant with the commission of any crime as charged was the false and fraudulent testimony of Elmer LaTour, and that the verdict of the jury and the judgment of the court is null and void by reason of the fraud practiced as alleged, without which a conviction would not have resulted, and praying that appellant, for this reason, be granted a new trial.

LaTour's affidavit sets out that he was home in bed when the explosion occurred, that he dressed and started away from his home, that he saw someone coming up the street from the east but did not recognize who it was; and that his testimony at the trial—that this person was William Davis and that Davis came down the street behind him,—was untrue. That he had been working at one of the plants involved in the strike and had continued to work after the strike had come on, had had trouble and difficulty with one of the apprentices and was "sore" at them. That the prosecuting attorney who knew these facts came to him between two and four days after the explosion and talked to him regarding what he had seen that morning. LaTour in his affidavit says:

"I told Hugh Maddox [the prosecuting attorney] in our conversation in his office that I saw Billy Davis after I got in front of Jack Winning's pool room and Hugh Maddox said, did he come down behind you or did he come down the stairway (from his sleeping room in the Eagles hall) and I told him I don't know . . . and Hugh Maddox said I would have to say that he came down the street after me, and I did so testify at the trial of said case and that the same is untrue. . . ."

La Tour's affidavit sets out another conversation with the prosecuting attorney in which:

"He also said that if he could stick two or three he could stick all of them. He told me in the first conversation that he could not stick any of them on circumstantial evidence; that he would have to have direct evidence and that I would have to say it was Billy Davis in order to stick him. At the time I testified and at the time Hugh Maddox talked with me concerning my testimony I was mad at the bunch and really wanted them convicted. . . . I make this statement of my own free will and accord without any coercion or compulsion and for the purpose of attempting to right the wrong that I have done."

In *Partlow* v. *State* (1922), 191 Ind. 657, 134 N. E. 483, where the appellant, while his main appeal (*Partlow* v. *State* [1920], 191 Ind. 660, 128 N. E. 436) was pending on petition for a rehearing, petitioned the trial court for a writ of *coram nobis* (which was denied and from which action he appealed), it was held that "there was no case pending in the court from which this appeal was taken at the time of the application for the writ *coram nobis* was presented to the court, upon which it could rest."

In *Partlow* v. *State* (1923), 194 Ind. 172, 141 N. E. 513, the same appellant, after the affirmance of the judgment against him (*Partlow* v. *State* [1920], 191 Ind. 660, 128 N. E. 436), the overruling the petition for a rehearing and the remanding of the cause to the lower court, again filed a petition in the lower court for a writ of error *coram nobis*, which was denied and from which action he appealed. This court there held that a trial court, after affirmance of its judgment upon appeal has no jurisdiction to grant a writ of error *coram nobis*.

In *Partlow* v. *State* (1924), 195 Ind. 164, 144 N. E. 661, the appellant finally obtained the relief he sought in the cases just referred to. In that case, an original proceeding in this court for an order directing the trial court to permit the filing of a motion for a new trial, it was held that, after affirmance of a conviction, this court has jurisdiction to entertain a petition for a writ directed to the trial court authorizing it to permit the filing of a motion for a new trial because of fraud in procuring the conviction and that the appellant who was convicted of knowingly receiving stolen property on the uncorroborated testimony of confessed thieves after the affirmance of the conviction on appeal, was entitled, on the production of affidavits by such witnesses, repudiating their testimony at the trial and declaring it false and fabricated by them, to a writ from this court directing the trial court to permit the filing of a motion for a new trial.

Considering all that has been said in the cases in this jurisdiction which have considered the writ *coram nobis* viz: The Partlow cases, *supra; Sanders* v. *State* (1882), 85 Ind. 318, 44 Am. Rep. 29; *Wheeler* v. *State* (1902), 158 Ind. 687, 63 N. E. 975; and *Trattner* v. *State* (1916), 185 Ind. 188, 113 N. E. 243, we conclude that the application for the writ was properly addressed to this court during the pendency of this appeal, and upon consideration thereof and consideration of the fact that the repudiated testimony was undoubtedly the strongest link in the chain of circumstantial evidence upon which the verdict of imprisonment rests, it is our opinion that a new trial should be granted.

There are a number of cases which hold that courts will not grant writs of error *coram nobis* to correct alleged false testimony given at the trial, see *Beard* v. *State* (1907), 81 Ark. 515, 99 S. W. 837; *Asbell* v. *State* (1900), 62 Kans. 209, 61 Pac. 690; *Wilson* v. *State* (1907), 46 Wash. 416, 90 Pac. 257; *State* v. *Superior Court* (1896), 15 Wash. 339, 46 Pac. 399. It will be noted that in *Beard* v. *State, supra,* and in *Wilson* v. *State, supra,* appeals had been prosecuted in the supreme courts of the states and the judgments there affirmed of the courts to which the applications were made, and that in *Asbell* v. *State, supra,* the facts complained of were known before the trial.

We are impressed with the position taken by the court in *State* v. *Superior Court, supra,* when it said:

"The law, upon considerations of public policy, will not receive the affidavit of a juror to impeach his verdict, and renders inadmissible the testimony of third persons as to what they heard jurors say in derogation of their verdict. Like considerations constrain us to hold that the remedy cannot be invoked upon a mere showing that the prosecuting witness has subsequently made contradictory statements or that she is now willing to swear that her

"former testimony upon the trial was false. Her latter oath is no more binding than her former one."

And we do not undertake hereby to lay down a general rule of law that a writ of error *coram nobis* should be granted whenever a material witness recants and admits perjury, but, in the sound discretion of the court, where, as here, it appears that the verdict most probably would not have been rendered except for such testimony and that there is a strong probability of a miscarriage of justice unless the writ is granted, it should be granted.

The prosecuting attorney referred to in appellant's petition and in LaTour's affidavit was present in this court when the cause was orally argued, but neither he nor the attorney-general controverted, denied or explained the allegations therein made during the argument, nor did the state seek to form an issue of fact upon appellant's petition for the writ by controverting the allegations thereof or offering counter-affidavits or in any other manner during the several months which have followed. If an issue had been formed on such petition, we might either have determined the same or referred it to the lower court for trial and determination, but no issue having been formed, we have proceeded under the assumption that the state admits the truth of the allegations thereof.

The attorney-general filed a brief in opposition to appellant's petition for the writ *coram nobis* in which he points out: (1) That LaTour did not specifically retract his testimony that the person he said was Davis whom he saw on High Street "had a high cap on, a light overcoat on his arm and had on a coat or sweater" and that when he saw Davis on Main Street about ten minutes later "he had his overcoat on and a dark high cap with a round bill," (2) urges that in view of the foregoing, the effect of LaTour's retraction is only to take away

from his evidence the *certainty* that the person he saw on High Street was William Davis; (3) that there remains in the record other evidence of appellant's guilt, to wit, that Davis and the picketing strikers Reeves, Meyers, Michaels and McPherson "were seen together about three hundred feet from the hotel talking with each other," and that shortly after the explosion appellant said to McPherson in reference to the explosion "Just keep your mouth shut. You don't know nothing about it," (this as we have seen was the testimony of Elmer LaTour); and (4) that the jury might have properly arrived at the same verdict without the evidence that the person seen on High Street was actually William Davis.

The record shows that a great deal of importance was attached to the testimony of LaTour in the trial court. The defense called several witnesses in attempting to disprove that he and Davis were on Main Street at the time and in the manner he testified, and the prosecution deemed his evidence so vital that four witnesses were called upon in rebuttal to testify that his general reputation for truth in the neighborhood was good. We cannot agree with the attorney-general that the taking away of the *certainty* of Davis's identification on High Street by LaTour would still leave in the record sufficient evidence to sustain the conviction.

Appellant's objections were overruled to the admission of the testimony of the witness Zella Barnes, a telephone switchboard operator, concerning a purported conversation between Bert McCullick, one of the codefendants, and Merle Marks, a walking delegate of the Molders Union. After she had testified that on the night of the explosion, she was on duty as toll operator for the Indiana Bell Telephone Company at Hartford City, that since that date she had seen Bert McCullick and heard him talk, that she did not know

him on that night, but at the time of testifying knew him when she saw him, and on cross-examination had stated that she had a conversation with him about voting on the day of a primary election, four months after the explosion, being three weeks before she gave her testimony, the court permitted her to testify as follows: That on the evening before the explosion occurred, she received a call from a person at Montpelier, giving the name of Bert McCullick, who said he wanted to talk to Merle Marks at telephone number Randolph 2478 in Indianapolis; that, after the connection was made, she "heard him say there was going to be something happen about nine o'clock," and in response to a question asked by counsel for appellant, on cross-examination, she said that the only way she knew that they had the Indianapolis party was "because he said he was Merle Marks." Appellant cannot successfully complain of testimony responsive to a question by his own counsel in answer to which it was given, nor has he attempted to do so. But he challenges the admission in evidence of what the witness said she heard Bert McCullick say over the telephone, because she did not know his voice at the time and had so little knowledge of it afterwards. However, any doubt as to whether or not the witness could sufficiently identify him from having heard his voice on one occasion so long after the telephone conversation went to the weight of her evidence, rather than its competency, and we cannot hold its admission to have been reversible error, *Greenberg* v. *Greenberg* (1921), 79 Ind. App. 218, 133 N. E. 18, 134 N. E. 311; *People* v. *Dunbar Contracting Co.* (1915), 215 N. Y. 416, 109 N. E. 554; *Shawyer* v. *Chamberlain* (1900), 113 Iowa 742, 111 N. W. 811; 3 Chamberlayne, Modern Law Evidence §1741c.

It appears, by a special bill of exceptions as to misconduct of counsel, that during the argument of counsel to the jury and while the judge presiding at the trial was

absent from the bench, in an adjoining room, special counsel for the state made certain statements, which were in part as follows:

"The policy of the law in reference to this defendant is so that even if this jury, and it is our policy, should return a verdict of guilty in the trial of a case like this, it is not under our law the end of the case, and the rights of the defendant have not even been closed. Under the Indiana System and America, if the Jury returns a verdict of guilty, the law still permits the defendant to make his motion for a new trial before the court, which now hears this case, and it is for the purpose that no innocent man will be punished in the end. He is permitted, and the Court reviews all the Jury has done, and then if the Court believes that the Jury has made an error, the Court will, and it is his duty, grant a new trial. I am discussing that the law is tender with the rights of the defendant. Now, if this Court should over-rule a motion for a new trial, the rights of the defendant is not yet closed, and he has a perfect right to appeal his case to the Supreme Court and the Supreme Court carefully reviews his case, after it is briefed by Counsel, and the case brought before that tribunal and if the Supreme Court believes error has been made by the Jury, the case is reversed. If, after the Supreme Court passes upon the case, the rights of the defendant is not yet closed, he has the right to appeal to the Governor of the State for pardon or reprieve. I will not permit Counsel for the defense to go further than I will go to show what rights an innocent man under the law of this state has for his protection and for the purpose that he may not suffer, and he has all of the tribunals, all of the courts of appeal to go to that I have mentioned. Now, Ladies and Gentlemen of the Jury, on the other hand, if the verdict in this case would be not guilty then the state is absolutely closed, the defendant under the law and under the Constitution of course goes acquit no difference how guilty he might be if you say, he is not guilty, it is of an end.

If you say he is guilty then the law gives him all of the advantages that I have stated."

The same counsel further said: "There were twelve of the codefendants of the defendant on trial who testified in this case, and only twelve of these codefendants."

Counsel for the defendant interrupted the special counsel for the state, caused the trial judge to return to the court room, objected to the statements made, moved the court to withdraw the submission of said cause from the jury and discharge the jury and discharge the defendant. The court thereupon announced that the said statement of counsel would be withdrawn from the jury and instructed and admonished the jury to disregard it and overruled the motion of the defendant to withdraw the submission of the cause, etc.

The appellant did not testify at the trial and he contends that the effect of the language last above quoted was to call attention to that fact, in violation of §2266, subd. 4, Burns 1926, which provides that the failure of a defendant to testify in his own behalf shall not be commented upon or referred to in the argument of the cause. We do not believe that this language was so prejudicial that its effect could not be neutralized by its express withdrawal from the jury and an admonition from the court that the jury should disregard it. Counsel did not directly mention the fact that appellant had not taken the stand and jurors sufficiently astute to catch any veiled reference to that fact which there may have been in what was said would be intelligent enough to understand and obey the admonition of the court when told that they must not permit such a reference to influence their minds in returning a verdict. *Frazier* v. *State* (1893), 135 Ind. 38, 34 N. E. 817; *Blum* v. *State* (1899), 154 Ind. 343, 56 N. E. 771.

The language used in the argument first above quoted, we deem erroneous and prejudicial. To urge the jury

to convict the defendant and tell them that if the trial court believed a mistake had been made it would grant a new trial, and that if the trial court did not, the defendant had the right to appeal to the Supreme Court which could reverse the case if it believed an error had been made and that after the Supreme Court had acted, the defendant had a right to appeal to the Governor for a pardon or reprieve, transcends the bounds of proper argument and is calculated to induce the jury to disregard their responsibility. *State* v. *Kring* (1877), 64 Mo. 591. These remarks may have been made in the excitement of argument by the eminent counsel who assisted the prosecuting attorney, without any intention of improperly influencing the jury in this case, but they were improper, and we deem it necessary to observe their impropriety because of the modern tendency to shift responsibility to reviewing tribunals. It should be constantly borne in mind that the function of courts of appeal is not to try cases *de novo* on the facts. Appeals are expensive, consume much time, are often unavailable and can be taken in but a small percentage of cases. It is therefore of paramount importance that all cases be tried in the *nisi prius* courts just as ably and as carefully as if no right of appeal existed, and an efficient and just administration of the law cannot be had unless there is a realization and acceptance of their complete responsibility by courts, juries and counsel in the trial courts.

Since a new trial has been determined upon on other grounds, it is unnecessary to decide whether the remarks of counsel for the state would require the judge to grant a new trial, or whether the error was cured by the court's admonition. Furthermore, appellant's motion asked that he be discharged, as well as that the submission be set aside and the jury dismissed, and it has been held that no available error was committed

in overruling a motion for relief to which one is not entitled, whatever else may also be asked by the motion.

The petition for the writ *coram nobis* is granted, the judgment is reversed, and the cause is remanded with directions to grant the appellant a new trial.